UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

PAIGE MARIE SNYDER,
f/k/a THOMAS A. SNYDER,

Plaintiff

v.

U.S. EQUITIES CORP., LINDA STRUMPF;
HAL SIEGEL; "RON WEST;" WING LAM;
SERVES YOU RIGHT, INC.; DAVID
WARSHALL; ALEX SHAFRAN; and
"JOHN DOE,"

Defendants.

Case No.:

CLASS ACTION
COMPLAINT

JURY TRIAL
DEMANDED

---

## INTRODUCTION

1.    Paige Marie Snyder brings this action on behalf of herself and thousands of other upstate

residents who wrongfully suffered default judgments as a result of the fraudulent conduct of the

Defendants, in violation of the Fair Debt Collection Practices Act, the Racketeer Influenced and

Corrupt Enterprises Act, the New York State Consumer Protection Law, and the New York Judiciary

Law.

## JURISDICTION and VENUE

2.    This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1692k(d) and 18 U.S.C. §§ 1961 - 68, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) and 18 U.S.C. § 1965.

## PARTIES

3.    Plaintiff, PAIGE MARIE SNYDER, ("Snyder")[1] is a transgendered person, formerly known as Thomas A. Snyder, who resides at 455 Clyde-Marengo Road, Clyde, NY , in Wayne County. Permission to adopt her current name was granted in an Order of the Supreme Court, Wayne County, in 1997.

4.    Defendant LINDA STRUMPF ("Strumpf") is an attorney, licensed to practice in the State of New York, who maintains an office at 69 Fox Run, South Salem, NY 10590. Strumpf resides and maintains another office at 244 Colonial Road, New Canaan, CT 06840. Her principal business is debt collection, and she regularly collects consumer debts alleged to be due to another.

5.    Defendant HAL SIEGAL ("Siegal") is Strumpf's husband. Upon information and belief, at all times relevant, Siegal was the office manager for Strumpf's firm. Also upon information and belief, at all times relevant, Siegal was the President and owner of Defendant U.S. Equities.

6.    Defendant "RON WEST" is, upon information and belief, an alias used by Siegal, and/or various employees of Strumpf.

---

[1] Snyder and all of the proposed members of the Class were defendants in the underlying actions in New York State courts and U.S. Equities was the plaintiff. To avoid confusion, we will refer to the named Plaintiff in this action, wherever possible, as "Snyder." "Plaintiffs" (unless otherwise noted) will used to refer to Snyder and all of the proposed Class members collectively.

2

7.    Defendant U.S. EQUITIES CORP. ("U.S. Equities") is a New York corporation. U.S. Equities is in the business of purchasing debt on the secondary market for collection, and is a "debt collector" as that term is defined in 15 U.S.C. § 1692a(6).

8.    According to the New York Department of State, the current principal office of U.S. Equities is located at 955 S. Springfield Ave., Ste 2407, Springfield, NJ 07081. Upon information and belief, that is also the address of Strumpf's New Jersey office.

9.    The current address for service of process on U.S. Equities is 244 Colonial Rd., New Canaan, Connecticut, 06840, which is Strumpf's Connecticut home and office. Upon information and belief, at various times relevant in this action, U.S. Equities and Strumpf have also shared office space at 2 West Road, South Salem, NY 10590 and at 111 John St., New York, NY 10039.

10.    Defendant WING LAM ("Lam"), is currently the "Chairman or Chief Executive Officer of U.S. Equities, according to the records of the New York Department of State, which states his address as 955 S. Springfield Ave., Suite 2407, Springfield, NJ 07081.

11.    Defendant SERVES YOU RIGHT, INC. ("SYR") was a New York corporation engaged in the process serving business. SYR was created on October 3, 2003 and dissolved on December 10, 2010, pursuant to a Consent Order and Judgment of the New York State Supreme Court, New York County, dated July 21, 2010. At all times relevant, the office of SYR was located at 30 South Ocean Avenue, Room 302, Freeport, NY 11520.

12.    At all times relevant, Defendant DAVID WARSHALL ("Warshall") was a process server, licensed with the New York City Department of Consumer Affairs, and the sole shareholder and officer of SYR. He resides at 1531 Moffitt Ave., Hewlitt, NY 11557.

3

13.    Defendant ALEX SHAFRAN ("Shafran"), at all times relevant, was, and is, a process server licensed with the New York City Department of Consumer Affairs.  Upon information and belief, Shafran was, and is, the Vice President of Tri-State Judicial Service, Inc ("Tri-State").

14.    Tri-State Judicial Service, Inc. is a New York Corporation. At all times relevant, Tri-State's office was located at 30 South Ocean Ave., Freeport, NY 11520, in the same building as the office of SYR.

15.    Defendant "JOHN DOE" is a fictitious name, used here to denominate one or more employees, agents or contractors of Strumpf, SYR, and/or U.S. Equities, whose identities are currently unknown, and who, upon information and belief, participated in the activities set forth below.

## FACTUAL ALLEGATIONS:
## PAIGE MARIE SNYDER

### Siegal's Letter

16.    On or about September 4, 2003, Snyder received a letter at her residence at 455 Clyde-Marengo Rd., in Clyde, NY, bearing Strumpf's letterhead, addressed to "Thomas A. Snyder," signed by Siegal as "Office Administrator."

17.    In that letter, Siegal stated the following:

> Please be advised that this law firm represents U.S. Equities Corp., who acquired your account from Citifinancial. As a result of a computer error by our office, we sent you a letter on or about June 24, 2003, which indicated an incorrect balance due to our client.
>
> The correct balance due, which you presently owe our client is: $8444.86, plus interest of $4025.83, plus attorneys fees of $), making a total of $12470.69, which is the amount of the debt now due. ...

4

18.     Despite Siegal's representation, Snyder had never received any previous letter from Strumpf's office.

19.     Shortly after receiving the letter from Siegal, Snyder had a telephone conversation with a man purporting to represent U.S. Equities, and denied that she owed the alleged debt.

20.     Snyder continued to reside at the aforementioned address, but did not receive any further communication from Strumpf's office for over seven years.

21.     Subsequent investigation has revealed that the original amount of Snyder's alleged debt to Citifinancial was $119.00, purportedly incurred in 1999; and that alleged debt had been purchased by at least one other collection agency before being "acquired" by U.S. Equities.

22.     Despite purporting to "correct" the "computer error by our office," Strumpf and Siegal had overstated the original alleged debt by a factor of ten.

## Strumpf's Complaint

23.     On November 17, 2003, Strumpf commenced an action on behalf of U.S. Equities against "Thomas A. Snyder" in New York State Supreme Court, by filing a Summons and Complaint with the Wayne County Clerk. The Complaint, signed by Strumpf, sought to recover an alleged debt originally owed to Citifinancial, in the amount of $8444.86, plus 12% interest from September 15, 1999, along with an additional 20% of the amount due as attorney fees.

24.     With her signature, pursuant to 22 NYCRR §§ 130-1.1( c) and 130-1.1a(b), Strumpf was representing to the Court that the Complaint did not assert material statements that were false, to the best of her "...knowledge, information and belief, formed after an inquiry reasonable under the circumstances."

25.     In fact, Snyder did not owe a debt to Citifinancial in any amount.

26.     Snyder never received service of the Summons and Complaint.

27.     On June 22, 2004, Strumpf filed a default judgment in favor of U.S. Equities against

"Thomas A. Snyder" with the Wayne County Clerk in the amount of $13,768.30. In support of that

judgment, Strumpf submitted an affidavit from Lam and an affidavit of service from Shafran.

**Lam's Affidavit**

28.     In his affidavit, "sworn to" and notarized by Strumpf on June 8, 2004, Lam stated the

following:

> a.)     that he was the "Accounts Manager" of U.S. Equities, and was
> "fully familiar with all the facts and circumstances of this case;"
>
> b.)     that pursuant to an "agreement" assigned to U.S. Equities, Thomas
> A. Snyder was indebted to Citifinancial in the amount of $8444.86
> plus 12% interest from 9/15/1999;
>
> c.)     that "the plaintiff [i.e., U.S. Equities] has personal knowledge of all
> the facts and circumstances of this action and knows same to be true
> based upon the information and documentation contained in the
> books and records in its possession. Further the plaintiff's knowledge
> is also obtained from information and documentation from the
> assignor Citifinancial." ;
>
> d.)     that "[a]n accounting was mailed by the plaintiff [i.e. U.S. Equities]
> to the defendant [i.e., Thomas A. Snyder] on 05/07/04." which was
> "retained without objection." and
>
> e.)     that "[u]pon information and belief," Snyder had "no valid defense
> to this action herein."

29.     Despite his sworn statement to the contrary, Lam could not have been "fully familiar with

all the facts and circumstances of this case." The "case" Lam described was a fiction, which had

nothing to do with any real "facts" or "circumstances."

30.    The "facts" asserted by Lam were false:

      a.)    There was no "agreement;"

      b.)    Paige Snyder had never incurred the alleged debt, in her own name or as Thomas A. Snyder;

      c.)    Paige Snyder never received the alleged "accounting" addressed to Thomas A. Snyder;

      d.)    There was obviously a "valid defense."

31.    The "plaintiff" to which Lam referred was U.S. Equities, an inanimate corporate entity. Unlike its officers or employees, "the plaintiff" had no capacity for "personal knowledge." Unlike a natural person, U.S. Equities could not "know" whether the alleged "facts and circumstances" were "true."

32.    Despite Lam's sworn statements, the alleged "facts" were not supported by "information" or "documentation" from any "books and records" in the "possession" of U.S. Equities or Citifinancial.

### The Shafran Affidavit

33.    Shafran's affidavit of service was purportedly signed and "sworn to" on April 18, 2004 before notary Ellen Warshall.

34.    The service described in Shafran's affidavit is known as "nail and mail." Under the New York Civil Practice Law and Rules, this method is only valid when the plaintiff, despite "due diligence," has been unable to make service by personal delivery to the defendant (under CPLR § 308(1)) or to a "person of suitable age and discretion" at the defendant's "dwelling" (under CPLR § 308(2)). "Due diligence" usually requires at least three attempts at personal delivery on different dates and times.

35.   Shafran's affidavit recited:

    a.)    that on March 2, 2004, Shafran had served Thomas A. Snyder by affixing a copy of the Summons and Complaint to the front door at 455 Clyde-Marengo Road in Clyde, NY;

    b.)    that Shafran had made three previous unsuccessful attempts at personal service at the aforementioned address, on January 17, January 27, and March 2, 2004;

    c.)    that the address had been "confirmed" for Shafran by "a neighbor, Ms. Hill"; and

    d.)    that Shafran had completed service by mailing a copy of the Summons and Complaint to Thomas A. Snyder at the above address on March 16, 2004.

36.   The evidence would later show that all of the above statements, purportedly "sworn to" by Shafran before Ms. Warshall, were false.

## The Information Subpoena

37.   On or about January 21, 2011, a deputy with the Wayne County Sheriff's Department personally delivered an Information Subpeona to Snyder's home, then sent a second copy of the same document to Snyder by mail.

38.   At about the same time, another copy of the Information Subpeona was sent by certified mail to William and Carol Cater, who own Snyder's residence at 455 Clyde Marengo Rd. The cover letter accompanying that Subpoena advised that a judgment had been entered against Thomas A. Snyder and recited the Snyder's complete Social Security number.

39.   The Information Subpoenas were signed by Strumpf and contained language warning that the failure to comply would be punishable as contempt of court.

8

40.     Snyder reasonably interpreted the Information Subpoena as threatening her with imprisonment if the judgment was not satisfied. While the prospect of time in jail would be frightening to anyone, it was especially horrifying to Snyder. Given her transgendered status, her fear of abuse in that environment was entirely justified.   She made plans for suicide if that possibility materialized.

41.     The emotional distress caused by the defendants exacerbated her pre-existing anxiety, caused a substantial and unhealthy loss of weight. It also required additional psychological treatment and medication, causing Snyder to incur additional medical expenses.

42.     The wrongful entry of the Judgment into the public record damaged Snyder's reputation and credit rating.

43.     The service of an Information Subpoena on Mr. and Mrs. Cater, and possibly other third parties was an embarrassing and unwarranted invasion of Snyder's privacy and contributed to her emotional distress.

44.     The disclosure of Snyder's Social Security number to Mr. and Mrs. Cates, and possibly other third parties, was also a violation of the New York Social Security Number Protection Law, N.Y. Gen. Bus. Law § 399-dd.

45.     Shortly after receiving service of the Information Subpoena, Snyder called Strumpf's office and spoke to a man identifying himself as "Ron West." She insisted that she did not owe the alleged debt, and asked the employee if he had any documentation. He said he did not. When Snyder asked Mr. "West" what she could do about this situation, he told her she could go bankrupt.

46.     On or about February 4, 2011, Snyder's attorney ("Hartnett") sent Strumpf a letter of representation, requesting notice before any further collection efforts, and threatening to obtain an Order if there was no voluntary compliance with that request. That letter was sent by facsimile to (212) 566-6808 and by mail to 111 John Street, New York, NY, 10038.

47.     Apparently, Strumpf no longer had an office at the John Street address. The letter was returned with the notation that it had been "refused." However, Strumpf had retained the same fax number, and transmission to that number was verified.

48.     In the course of investigating the alleged debt, Hartnett spoke with a representative of Asset Acquisition Group, LLC, who stated that in 2001, his company had purchased a debt from Citifinancial in the amount of $119.00, allegedly owed by Thomas A. Snyder, and then sold that debt to U.S. Equities in 2003. Hartnett advised that representative of the amount of the judgment and that Snyder had never been served.

49.     On or about March 25, 2011, shortly after his conversation with the aforementioned representative, Hartnett received a call from "Ron West" at Strumpf's office. Mr. "West" acknowledged that he had received a call from Asset Acquisition Group. He asserted that there had been a mistake and the judgment would be vacated. Hartnett attorney agreed that the judgment should be vacated and advised told "West" that Snyder would be seeking compensation for Strumpf's conduct.

**Snyder's Motion for Vacatur**

50.     On March 28, 2011, Hartnett received, in a fax from Strumpf, a copy of a "Vacatur of Judgment and Discontinuance of Action" which she had sent to the Wayne County Clerk for filing. Hartnett intended to file an Answer with Counterclaims, and had never agreed to a discontinuance.

51.     Snyder, by Order to Show Cause, brought a motion to set aside the judgment for fraud on the court, based on Strumpf's Complaint and the affidavits of Shafran and Lam. She also requested leave to file an Answer with Counterclaims and imposition of sanctions against Strumpf and U.S. Equities.

52.     In addition to her own affidavit, in which she denied incurring the debt or receiving service, Snyder offered the affidavit of Tracy Hill, who, according to Shafran's affidavit, had "confirmed" Snyder's address.

53.     "Ms. Hill" was, in fact, Snyder's "neighbor" on the date set forth in Shafran's affidavit. That information was readily available in 2004 from several databases routinely used in the process serving business. "Ms. Hill" knew that Snyder had changed her name and was now living as a woman. She stated that she would have remembered a stranger inquiring about the address of "Thomas A. Snyder," and no such inquiry was ever made.

54.     Hartnett also submitted an affidavit in which he stated that:

> a.) Shafran's office at Tri-State was 300 miles from Snyder's residence in Clyde, NY;
>
> b.) According to the "e-courts" website for the NYS Unified Court System and a random sample of affidavits filed with upstate courts, it appeared that Strumpf used Tri-State almost exclusively, rather than local process servers, and service was almost always by "nail and mail."

11

      c.)    Shafran had signed an affidavit filed in Bronx County, swearing
              that he had served a defendant at 340 Audubon Ave. in New York
              City, on March 2, 2004. That was the same day he claimed to be in
              Clyde, NY, taping Strumpf's Complaint to the door of "Thomas A.
              Snyder" and confirming the address with "Ms. Hill."

      d.)    In two other affidavits submitted by Strumpf for U.S. Equities,
              Shafran swore that he served two defendants in the City of Geneva
              between 7:20 PM and 7:32 PM on July 10, 2006. However, in an
              affidavit filed by another plaintiff, Shafran swore that on the same
              date, at 6:48 PM, he attempted to serve a third defendant in the Bronx.

55.    Shafran was served with the Order to Show Cause, but did not appear.

**Strumpf's Response**

56.    In response to Snyder's post-judgment motion, Strumpf submitted an "Affirmation in Opposition," ("Opposition") dated July 15, 2011 and an "Affirmation in Reply," ("Reply") dated September 30, 2011.

57.    Strumpf admitted that Snyder had not, in fact, been served with the Summons and Complaint. However, she denied that either she or U.S. Equities bore any responsibility for Shafran's false affidavit, and claimed that the New York Attorney General had found her innocent of any wrongdoing.

58.    Strumpf asserted that her office erroneously transcribed the amount of Snyder's debt from the information provided by U.S. Equities in 2003. Thus, she claimed, the incorrect judgment was solely the result of one honest mistake, which she corrected as soon as it was discovered.

59.    As shown below, none of Strumpf's excuses were supported by the record.

### The Affidavit of Service

### Strumpf's Process Server

60.    In her Opposition, Strumpf triumphantly seized upon a misstatement in Hartnett's affidavit.

61.    According to published judicial opinions and the New York Department of State, Shafran was an officer of Tri-State. Based on the affidavit Shafran had signed on behalf of U.S. Equities, in Snyder's case as well as several others, Hartnett assumed that Strumpf must have retained Tri-State. However, Strumpf explained that "...I did not 'employ' Mr. Shafran, but forwarded summonses and complaints to SYR, who then apparently used Mr. Shafran, among others, to serve process.",

62.    Strumpf offered no explanation for the affidavits Shafran signed in 2006, in which he swore that he simultaneously served two defendants in Geneva and another in the Bronx. She stated, however, that she had retained SYR (not Tri-State) for service in the Geneva cases, just as she did for Snyder's case in 2004. In fact, she said, "[d]uring that entire period of time I forwarded my summonses and complaints to SYR for service."

63.    Hartnett's error was irrelevant. SYR and Tri-State were located in the same building in Freeport, NY. Whether he was working for SYR or his own company, Shafran would have had to travel the same distance to attempt service on Snyder in Clyde, NY.

64.    Unlike Hartnett's error, Strumpf's correction was significant. Strumpf had acknowledged that "during that entire period of time" between January 17, 2004 (when Shafran claimed he was in Clyde, NY) to July 10, 2006 (when he swore he was in Geneva and New York City) SYR was doing all of the process service for her office.

13

65.    From 2004 through 2006, Strumpf brought more than 1500 lawsuits against defendants located more than 100 miles from SYR's office. For all of those cases, Strumpf retained SYR rather than a local process server. Upon information and belief, in nearly all of those cases, including Snyder's, Strumpf took a default judgment, and submitted an SYR affidavit stating that the defendant was served by "nail and mail." The notion that Strumpf did not know that those affidavits were false defies belief.

66.    In the judgment she filed for U.S. Equities against Snyder, Strumpf included $25.00 as a disbursement for service of process. In return, based on his affidavit, Shafran purportedly made three round trips from his office in Freeport, NY to Clyde, NY, a distance of over 300 miles each way. It is impossible for a reasonable person to believe one such affidavit, and certainly not 1500.

### The Assurance of Discontinuance

67.    On April 29, 2011, Strumpf entered into an "Assurance of Discontinuance" ("AOD") with the New York Attorney General. The AOD arose from an investigation in which the Attorney General, together with the Audit Division of the New York State Unified Court System, examined affidavits of service executed by employees of SYR from 2007 through 2009.

68.    The AOD specifically stated that the Attorney General was not making a finding one way or the other on the issue of whether Strumpf knowingly filed false affidavits. The AOD also provided that it "...may not be used as evidence in any judicial or administrative hearing , proceeding or action..."

69.    Ignoring the express terms of the AOD, Strumpf submitted that document as evidence of her innocence, asserting that it "...specifically states that the Attorney General found that I had no knowledge of any falsified affidavits; that I committed no wrongdoing and I have no liability."

14

70.     Strumpf had publicly disclosed the AOD and asked the Court to adopt a "finding" the Attorney General never made. Having done so, she is in no position to object when Snyder asks the Court to consider the Attorney General's actual findings.

71.     Based on the findings in the AOD, the Attorney General concluded that "[o]n a repeated and persistent basis, in support of her motions for default judgments, Strumpf submitted affidavits of service prepared by SYR in which the process server falsified service attempts."

### Strumpf's Complaint, Lam's Affidavit and the Default Judgment

72.     In her Opposition, Strumpf claimed that "I discovered for the first time on March 25, 2011, that through a computer error which my office made in 2003, my office input the incorrect amount of the debt for the above-captioned case in our computer. That error was not committed by [U.S. Equities], but by my office. [U.S. Equities] provided my office with the correct information. The amount of the debt for this case was inadvertently switched with that of another case by my office."

73.     March 25, 2011 was the date of "Ron West's" telephone call to Hartnett, promising to vacate the judgment. That only occurred after West was contacted by Asset Management. Apparently "West" had been informed that Hartnett knew the true amount of the debt purchased by U.S. Equities and that Strumpf had filed a false affidavit of service.

15

74.    Strumpf's claim that she was unaware of the true amount of the alleged debt until March 25,

2011 is not consistent with the facts. If there was actually a "computer error" by her office in 2003,

it had certainly been discovered long before 2011: The facts show that the false allegations about

the alleged debt were made intentionally or with reckless disregard for the truth, on the part of both

Strumpf and U.S. Equities:

- a.)    Siegal, then an officer of U.S. Equities, wrote to Snyder as Strumpf's "Office Administrator" on September 4, 2003, stating that stated that "a computer error by our office" as to the amount of the alleged debt had been corrected, and the "correct balance due" was $ 8444.86 plus interest.

- b.)    There was no change made to that demand thereafter, despite Snyder's denial that she owed that debt.

- c.)    When she signed the Complaint, Strumpf represented that she made a reasonable inquiry into the facts, but the principal amount demanded in the Complaint was the same as Siegal's "correct balance due."

- d.)    Strumpf had an obligation to make sure the amount demanded was correct before submitting the default Judgment to the Clerk, but the principal amount demanded remained the same.

- e.)    In his affidavit in support of the default Judgment, Lam, the U.S. Equities "Accounts Manager" claimed to be "fully familiar with the facts," yet represented that Snyder owed the same principal figure of $8444.86.  He also swore that U.S. Equities had "personal knowledge" of the debt, based on its own "books and records," as well as "documentation" from Citifinancial.

- f.)    Strumpf had another opportunity to verify the principal amount demanded before sending out the Information Subpoena for service, but that misrepresentation continued.

- g.)    Strumpf's office had additional notice that the amount alleged was false when Snyder called and once again denied owing the debt.

       h.)    Strumpf had another occasion to check her figures after receiving
Hartnett's fax on February 4, 2011, advising that he had been
retained to represent Snyder with regard to that debt. Again, no
action was taken to "correct" this purported "error."

75.    Strumpf, Lam, Siegal and U.S. Equities all misrepresented the alleged debt. The facts show

that those misrepresentations cannot be attributed to a "computer error" in 2003. These Defendants

either knew their allegations were false, or they deliberately chose to ignore the truth.

**The Supreme Court's Decision**

76.    In an Order dated January 3, 2012, Hon. John B. Nesbitt, J.S.C., directed vacatur of the

judgment, dismissal of the action with prejudice, and payment of $2833.21 in costs and attorney fees.

## CLASS ALLEGATIONS

## CLASS DESCRIPTION

77.    Snyder brings this action on behalf of herself and all others similarly situated. She seeks

to represent a class defined as follows:

> All persons against whom default judgments have been entered in actions
> commenced by Strumpf for U.S. Equities, retaining SYR to serve process, in
> any New York State court located more than 100 miles from Freeport, NY.

78.    Excluded from the class are any such persons who have signed a stipulation accepting a

vacatur of a default judgment pursuant to the AOD.

## FRCP RULE 23

79.    This action has been brought and may properly be maintained on behalf of the Class

proposed above under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

**Numerosity**

80.    Members of the Class are so numerous that their individual joinder in this action would be impracticable.

81.    Based on the data available online from the New York State Unified Court System, the AOD, Strumpf's prior admissions, and a review of SYR affidavits of service obtained from selected courts, there are approximately 3000 members of the proposed class. The names and addresses of the Class members can be ascertained from records maintained by Strumpf and SYR.

**Existence and Predominance of Common Questions**

82.    Common questions of fact and law exist among Snyder, the named Plaintiff herein, and the Class members. Those questions include whether Strumpf's misrepresentations to the Plaintiffs and the Courts violated § 487 of the New York Judiciary Law; and whether the actions of all of the Defendants, described herein, violated the Fair Debt Collection Practices Act, the Racketeer Influenced and Corrupt Organizations Act, and the New York Consumer Protection Act. These common questions predominate over any individual issues.

**Typicality**

83.    Defendants' fraudulent conduct resulted in the improper entry of default judgments against Snyder and all of the proposed Class members, causing serious harm. The claims and practices alleged herein are common to all members of the proposed Class.

84.    The violations suffered by Snyder are typical of those suffered by the entire Class.

18

**Adequacy**

85.     Neither Snyder nor her attorneys have any conflict of interest with any of the proposed Class members. Snyder's principal attorney has been a member of the bar of this Court for over 27 years and has litigated matters before New York State and Federal trial and appellate courts, including a complex class action matter. He is supported by two other experienced attorneys and a paralegal at Craig J. Billinson & Associates.

**Superiority**

86.     This class action is superior to any other available means for the fair and efficient adjudication of the Class members' claims. The damages suffered by each individual Class member may be outweighed by the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.

87.     Aside from being prohibitively expensive for individual Class members, prosecution of separate actions would be a waste of judicial resources. It could also result in inconsistent and contradictory judgments.

88.     By contrast, the class action device provides economies of scale, comprehensive supervision by a single court, and a single adjudication of common issues.

## COMMON FACTS

### Background

#### Documentation

89.     U.S. Equities is a "debt buyer." Debt buyers are companies that buy defaulted, charged-off debts for pennies on the dollar and then seek to collect the full face value of the debts for themselves. Many debt buyers also resell debts to other debt buyers. Thus, it is not uncommon for debts to be bought and sold numerous times over.

90.     A typical purchased portfolio of debts contains, for each account listed in the portfolio, the consumer's name, Social Security number, last known address and telephone number, the account number, charge-off date, date and amount of last payment, and alleged amount owed. This information is transmitted to the debt buyer electronically in the form of a spreadsheet and is often referred to as "media." The debt buyer typically does not purchase or obtain documents showing an indebtedness between the original creditor and debtor, such as a contract and any subsequent amendments to the contract, account statements, customer service records, or customer dispute records.

91.     Most debt purchase and sale agreements provide the buyer with little or no opportunity to access the original account documentation. Such access becomes even less available, if not impossible, with each time a debt is resold.

92.     Under New York law, debt buyers, like other plaintiffs in civil lawsuits, bear the burden of proving a cause of action. To meet that burden, the debt buyer must submit admissible evidence demonstrating that it is the rightful owner of the account and that the defendant actually owes the debt in the precise amount claimed.

20

93.    Debt buyers generally bring lawsuits based solely upon the skeletal "media" obtained
upon purchase of the account portfolio. That is wholly inadequate to meet the requisite burden of
proof. Recent court decisions have confirmed that many debt buyers do not possess, and cannot
obtain, the evidence required to make out a *prima facie* case. Without such proof, a debt buyer is
not entitled to a judgment, even on default.

94.    In the vast majority of debt collection lawsuits, the defendant defaults. Accordingly, debt
buyers are rarely put to their proof. Default judgments are typically obtained with a simple
application to a clerk, rather than the court.

95.    In their case against Snyder, U.S. Equities and Strumpf did not, and could not, produce
the admissible evidence needed to support a default judgment. There was no documentation of
the alleged debt. There was no affidavit from anyone with personal knowledge of the underlying
transaction. Instead they produced an affidavit from Lam, who falsely claimed to be "fully aware
of the facts and circumstances," and falsely asserted that U.S. Equities had "personal knowledge"
based on its own "books and records" and "documentation" from Citifinancial, the alleged
original creditor.

96.    U.S. Equities and Strumpf have obtained thousands of default judgments in New York.
Given their track record, and the custom and practice in their industry, it is unlikely that any of
those judgments could have been supported with the requisite evidence. It would be reasonable
to infer that in those cases, as in Snyder's, the judgment was obtained with an affidavit from
someone falsely claiming to have "personal knowledge" of the alleged debt.

**Service**

97.     In New York, "sewer service" and debt collection have long gone hand in hand.

98.     The term "sewer service" is widely used to describe the practice of failing to serve a Summons and Complaint and then filing a false affidavit of service, which usually results in a default judgment.

99.     In 1986, the New York Attorney General and the New York City Department of Consumer Affairs ("DCA") investigated sewer service and issued what is known as the "Joint Report."

100.    The Joint Report concluded that 39% of the service in New York City was sewer service and a third of the default judgments there were entered illegally.

101.    The Joint Report placed the blame for sewer service on the low pay for process servers. At the time, debt collection attorneys paid six to twelve dollars to process serving agencies per service of process. The agencies, in turn, generally paid only three dollars to the individual process server. Moreover, the process server was paid only for completed services, not for unsuccessful attempts.

102.    The Joint Report also detailed the experience of an investigator hired by the DCA to work for a month as a licensed process server. The investigator was given over 400 papers to serve and was paid three dollars per completed service. The server found that half of the defendants no longer lived at the addresses provided. After 517 attempts, he was able to serve only 217 complaints, earning a total of $ 651 for the month, before deducting expenses.

103.    Sewer service, under these conditions, cannot be blamed on a few unscrupulous process servers. It is inherent in a system which pays a process server $3 to $7 per complaint, regardless of time or expenses, and only if service is completed. With every attempt made, and every mile he travels, the process server is losing money.  Unless a defendant is nearby and always home, the process server must choose between earning a living and committing perjury.  Obviously, the likelihood of a false affidavit of service increases with distance, and, at some point, it becomes a virtual certainty.

104.    The Joint Report concluded that process serving agencies, by underbidding the true cost of proper service, effectively sold sewer service.

105.    In April 2008, MFY Legal Services issue a report, *Justice Disserved*, documenting highly questionable process serving practices in consumer credit cases.

106.    On June 13, 2008, the New York City DCA held a public hearing on process servers. Testimony at the DCA hearing revealed that:

> a.)    process serving agencies generally charge between $15 and $45 for service of a summons and complaint in a consumer credit action in New York City;
>
> b.)    the agencies retain most of the fee to pay overhead; and
>
> c.)    individual servers were paid between $3 and $6 per completed service.

107.    At the DCA hearing, witnesses from the process serving agencies testified that debt collection attorneys will not pay for service attempts that are not completed.  Executives from three agencies testified that they will not accept work from debt collection attorneys because it was impossible to make a profit without resorting to sewer service.

108.    Upon information and belief, the agreement between Strumpf and SYR to serve process for U.S. Equities was substantially the same as the arrangement described in the DCA testimony.

109.    In 2008 and 2009, following the DCA hearing, the Attorney General audited the process server logs of an agency called American Legal Process ("ALP"). The Attorney General found that ALP was paid between \$30 - \$ 35 per service by the debt collection law firms and paid its servers between \$3 and \$5 per service.

110.    The ALP audit revealed rampant sewer service. This practice was undeniable when the logs recorded service attempts that were physically impossible. For example, one server claimed to have made 69 service attempts in a single day in two different counties that were 400 miles apart. The owner of ALP was prosecuted and incarcerated.

111.    In July of 2009, the Attorney General and the Chief Administrative Judge of the New York Courts brought a civil proceeding against APF and 37 debt collection companies and law firms. That proceeding, Matter of Pfau v. Forster & Garber, et al, (Index No. 8236/09, Supreme Court, Erie County) was settled by a Consent Order. Pursuant to the Consent Order, all defendants purportedly served by ALP using "nail and mail" service whose default judgments had not been satisfied were to be notified of an opportunity to sign a stipulation vacating the judgment.

112.    After the Pfau proceeding, the Attorney General performed a similar audit on SYR, with similar results. The Attorney General commenced a special proceeding against SYR and Warshall in New York Supreme Court, New York County (Index No. 401867/10). That proceeding was also settled by a Consent Order, in which Warshall agreed to pay a \$50,000 fine, to permanently refrain from engaging in the business of process serving, and to dissolve SYR.

24

113.   The Attorney General contacted the debt collection attorneys that used SYR's services,

including Strumpf, offering to forego a special proceeding against them if they agreed to the

same terms as the attorneys that employed ALP. Strumpf agreed. The terms are set forth in the

Assurance of Discontinuance ("AOD"), which she submitted as evidence in Supreme Court.

114.   The AOD recited several of the Attorney General's findings regarding SYR, including the

following:

> a.)   Between January 2007 and September 2009, SYR claimed to have
> served process on more than 35,000 occasions and prepared affidavits
> of service for each one.
>
> b.)   In more than 800 of those affidavits, SYR process servers swore that
> they had made service attempts at multiple addresses at the same time;
> a physical impossibility.
>
> c.)   SYR servers repeatedly and persistently swore that they made service
> attempts which were physically impossible given the time and distance
> between those attempts.
>
> d.)   On at least 80 occasions, SYR servers swore that they made service
> before the summons and complaint were filed.
>
> e.)   On at least one occasion, an SYR server swore to have made service
> three weeks after the defendant had died.

115.   Based on the foregoing, the Attorney General concluded that SYR persistently and

repeatedly falsified service attempts in nail and mail cases.

116. The Attorney General also made several findings related to Strumpf, including the following:

- a.) From January 1, 2007 through September 30, 2009, Strumpf used SYR to serve papers on approximately 4,020 occasions.

- b.) On 2,562 of those occasions, SYR used substituted or nail and mail service.

- c.) In the majority of those cases, Strumpf filed default judgments.

117. Based on the foregoing, the Attorney General concluded that "[o]n a repeated and persistent basis, in support of her motions for default judgments, Strumpf submitted affidavits of service prepared by SYR in which the process server falsified service attempts."

118. Strumpf agreed in the AOD to identify all actions filed since January 1, 2006 in which she filed obtained a default judgment after filing an SYR affidavit alleging nail and mail service. She also agreed (with certain exceptions) to notify the defendants in those cases that they could stipulate to a vacatur under the terms of the AOD. If, after such a vacatur, Strumpf did not timely recommence the action, she and the plaintiff (usually U.S. Equities) agreed to return any money collected from the defendant.

119. The AOD also provided that any defendants who did not receive notice because their actions were commenced prior to January 1, 2006 could opt in by giving written or oral notice to Strumpf before April 24, 2012.

120. Any defendant stipulating to a vacatur under the terms of the AOD was required to waive any claims against Strumpf or the plaintiff (i.e., U.S. Equities). The defendants who choose not to stipulate are not bound by the AOD.

26

## AS AND FOR A FIRST CAUSE OF ACTION:
## VIOLATION OF THE FAIR DEBT COLLECTION
## PRACTICES ACT

121.   Plaintiffs hereby restate, reallege, and incorporate by reference the foregoing paragraphs.

122.   Plaintiffs are "consumers" within the meaning of the Fair Debt Collection Practices Act

("FDCPA") which was enacted to stop the "use of abusive, deceptive and unfair debt collection

practices by many debt collectors," as set forth in 15 U.S.C. § 1692(a).

123.   Defendants are all "debt collectors" within the meaning of the FDCPA. A process server

is exempted from the definition of a "debt collector" only insofar as the process server is in fact

"serving or attempting to serve legal process" as set forth in 15 U.S.C. § 1691a(6)(D).

124.   Defendants violated the FDCPA, 15 U.S.C. §§ 1692d, 1692e, 1692e(2)(A), 1692e(10)

and 1692f by making false and misleading representations and engaging in unfair and abusive

practices. Defendants' violations include, but are not limited to:

       a.)   Producing and filing fraudulent affidavits of service that falsely
            claimed that Plaintiff and Class members were served with a
            Summons and Complaint when in fact they were not;

       b.)   Producing and filing false attorney affirmations stating that service
            of the Summons and Complaint had been made when it was not;

       c)   Filing Complaints signed by an attorney falsely representing to
            be in compliance with 22 NYCRR 130-1.1, which requires a certif-
            ication that the action is not frivolous and the attorney has made a
            reasonable inquiry into the facts;

       d.)   Producing and filing fraudulent affidavits of merit that falsely
            claimed that Defendants had personal knowledge of the facts
            necessary to obtain a default judgment, when in fact they did not;

e.) Misrepresenting that Defendants were in possession of or could obtain documentation evidencing that Plaintiffs owed debts, when in fact they did not possess and could not obtain such documentation;

f.) Using fraudulent, deceptive, and misleading affidavits and affirmations to obtain default judgments against Plaintiffs under false pretenses;

g.) Using fraudulently obtained default judgments to extract, or to attempt to extract, money from Plaintiffs;

125. As a direct and proximate result of Defendants' violations of the FDCPA, Plaintiffs have sustained actual damages in an amount to be proved at trial and are also entitled to statutory damages, costs and attorneys' fees.

## AS AND FOR A SECOND CAUSE OF ACTION: RACKETEER INFLUENCED AND CORRUPT ENTERPRISES ACT

126. Plaintiffs hereby restate, reallege, and incorporate by reference the foregoing paragraphs.

127. Plaintiffs are natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

128. Defendants are natural persons and corporate entities, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

**The Enterprise**

129. Upon information and belief, the Defendant individuals and entities, taken together, were an "association-in-fact" within the meaning of 18 U.S.C. § 1961(4).

130. The purpose of the enterprise has been to secure default judgments through fraudulent means and to use those judgments to extract money from the Plaintiffs.

131.   To accomplish the purpose of the enterprise, U.S. Equities, together, at various times, with Siegal and Lam, purchased debts for collection. Strumpf commenced actions on behalf of U.S. Equities. SYR, Warshall, Shafran and other SYR employees produced false affidavits of service in those actions. U.S. Equities, Siegal, Lam, and/or other officers, directors, employees, agents or contractors of U.S. Equities and/or Strumpf, provided false affidavits of merit. Strumpf then submitted those false affidavits and her own false affirmation to the Clerk of the Court to fraudulently obtain a default judgment. Strumpf, Siegal, and/or other employees, agents or contractors of Strumpf and/or U.S. Equities then used the fraudulently obtained default judgments to extract money, or attempt to extract money, from the Plaintiffs. Money obtained from this enterprise was distributed to the Defendants and used by U.S. Equities to purchase more debt.

132.   For at least five years, this enterprise engaged in activities that affect interstate commerce.

## Pattern of Racketeering Activity

### Mail and Wire Fraud

133.   Defendants, individually and collectively, as an Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity, as described below, in violation of 18 U.S.C. §§ 1962( c) and (d).

134.   Defendants, acting individually and as part of the Enterprise, have devised a scheme to defraud and to obtain money or property by means of false or fraudulent pretenses and representations. The scheme included, but was not limited to:

    a.) Producing and filing fraudulent affidavits of service that falsely claimed that Plaintiffs were served with a Summons and Complaint when in fact they were not;

29

b.) Producing and filing false attorney affirmations stating that service of the Summons and Complaint had been made when it was not;

c) Filing Complaints signed by an attorney falsely representing to be in compliance with 22 NYCRR 130-1.1, which requires a certification that the action is not frivolous and the attorney has made a reasonable inquiry into the facts;

d.) Producing and filing fraudulent affidavits of merit that falsely claimed that Defendants had personal knowledge of the facts necessary to obtain a default judgment, when in fact they did not;

e.) Misrepresenting that Defendants were in possession of or could obtain documentation evidencing that Plaintiffs owed debts, when in fact they did not possess and could not obtain such documentation;

f.) Using fraudulent, deceptive, and misleading affidavits and affirmations to obtain default judgments against Plaintiffs under false pretenses;

g.) Using fraudulently obtained default judgments to extract, or to attempt to extract, money from Plaintiffs;

135. Defendants, acting individually and as part of the Enterprise, have made fraudulent

misrepresentations on specific occasions as follows:

a.) On April 29, 2004, Defendants filed a fraudulent affidavit with the Wayne County Clerk, which falsely stated that Shafran had made three separate attempts to serve "Thomas A. Snyder," that he had affixed a copy of the Summons and Complaint to Snyder's door, that he had confirmed Snyder's address with "Ms. Hill," and that he had mailed a copy of the Summons and Complaint to Snyder's address.

b.) On June 22, 2004, Defendants filed a fraudulent affirmation with the Wayne County Clerk, falsely stating that Snyder had been properly served.

c.) On June 22, 2004, Defendants filed a fraudulent affidavit with the Wayne County Clerk, falsely stating that Lam was "fully familiar" and U.S. Equities had "personal knowledge" of the facts set forth in the Summons and Complaint.

      d.)     On October 5, 2006, Defendants filed a fraudulent affidavit with the Clerk for the Geneva City Court, falsely stating the Shafran made three separate attempts to serve Jean A. Chamis, that Mr. Akens had confirmed her address, that Shafran affixed a copy of the Summons and Complaint to Chamis' door, and that he mailed a copy of the Summons and Complaint to Chamis.

      e.)     On October 5, 2006, Defendants filed a fraudulent affidavit with the Clerk for the Geneva City Court, falsely stating that Shafran made three separate attempts to serve Derron R. Wise, that Mr. Grady had confirmed Wise's address, that he affixed a copy of the Summons and Complaint to Wise's door, and that he mailed a copy of the Summons and Complaint to Wise.

136.    Defendants, acting individually and as part of the Enterprise, have used the mails and

wires and have cause the mails and wires to be used, or reasonably knew the mails and wires would

be used, in furtherance of their fraudulent scheme. Specifically:

      a.)     On or about June 22, 2004, Defendants used the mails to deliver a proposed default judgment and affidavit to the Wayne County Clerk.

      b.)     On or about October 5, 2006, Defendants used the mails to deliver two fraudulent affidavits to the Clerk for the Geneva City Court.

      c.)     On or about September 4, 2003, Defendants used the telephone in an attempt to collect a debt from Snyder

137.    Defendants used the mails and wires in connection with every default judgment that they

have fraudulently obtained, and each use of the mails and wires has furthered their fraudulent

scheme.

31

138.   Upon information and belief, each Defendant had specific actual knowledge that the mail and wires were being used in furtherance of the fraudulent purpose of their Enterprise. In fact, under the New York Civil Practice Law and Rules, use of the mail was a requirement for substituted service and "nail and mail," methods of service consistently cited in the affidavits of service relied upon by the Defendants.

139.   Further, Defendants consistently used the mail to file all of the required pleadings, exhibits and documents required to obtain each of the default judgments obtained against the Plaintiffs.

140.   Each of the thousands of uses of the mail and wires in connection with Defendants' fraudulent scheme, spanning a period of over five years, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343, and thus is also a predicate act, which taken together, constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

141.   In connection with the Defendants' scheme, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1963 et seq., and on countless occasions over a substantial time period within ten years of each other.

## Relationship of the Pattern of Racketeering Activity to the Enterprise

142.   The pattern of racketeering activity described above was integral to Defendants' scheme. Without engaging in mail and wire fraud, Defendants would be not have been unable to obtain the default judgments they sought.

32

143.   Each Defendant, individually and as a member of the Enterprise, has conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above. Accordingly, each Defendant has violated 18 U.S.C. § 1962(d).

144.   As a direct and proximate result of the RICO violations described in this Complaint, Plaintiffs have suffered substantial injuries to property within the meaning of 18 U.S.C. § 1964 by the actions of Defendants and their co-conspirators in violation of 18 U.S.C. § 1962(c) and (d). Plaintiffs have been deprived of due process, had money judgments entered against them on default, which have been used to extract money and attempt to extract money by restraining and levying on their bank accounts, causing them to incur bank fees and miss work days, garnishing their wages, damaging their credit ratings.

145.   Defendants' conduct has involved and poses a threat of long term criminality.

146.   For the violations of 18 U.S.C. § 1962 described in this Complaint, Plaintiffs are entitled to recover compensatory and treble damages in an amount to be determined at trial, and to an Order directing Defendants to disgorge their ill-gotten gains in order to deter similar conduct in the future.

## AS AND FOR A THIRD CAUSE OF ACTION:
## N.Y. GENERAL BUSINESS LAW § 349

147. Plaintiffs hereby restate, reallege, and incorporate by reference all foregoing paragraphs.

148. Defendants, by the conduct set forth above, violated N.Y. GBL § 349 by using deceptive acts

and practices in the conduct of their businesses.

149. Defendants conduct has a broad impact on consumers at large.

150. Defendants committed the above-described acts willfully and/or knowingly.

151. As a direct and proximate result of Defendants' wrongful and deceptive acts in violation of

N.Y. GBL § 349, Plaintiffs have suffered compensable harm and are entitled to recover actual and

treble damages, costs and attorney fees.

## AS AND FOR A FOURTH CAUSE OF ACTION:
## MALICIOUS PROSECUTION

152. Plaintiffs hereby restate, reallege, and incorporate by reference all foregoing paragraphs.

153. Defendants commenced actions against the Plaintiffs.

154. At the time the actions were commenced, they had no probable cause to succeed.

155. The actions were commenced with conscious awareness of their falsity, and were therefore

malicious.

156. The actions have been resolved favorably to the Plaintiffs.

157. As a direct and proximate result of the malicious prosecution of these actions, the Plaintiffs

have suffered pecuniary and non-pecuniary damages.

## AS AND FOR A FIFTH CAUSE OF ACTION
## AGAINST DEFENDANT STRUMPF:
## ATTORNEY MISCONDUCT IN VIOLATION
## OF N.Y. JUDICIARY LAW § 487

158.   Defendant Strumpf, acting in concert with the other Defendants, repeatedly and persistently prepared, signed, submitted and filed false and fraudulent affidavits, affirmations and pleadings in thousands of actions against the Plaintiffs with courts and county clerks throughout New York State.

159.   Strumpf, at all times relevant, knew the aforementioned documents were false, and/or acted in reckless disregard for their truth or falsity.

160.   Strumpf submitted and filed the aforementioned documents with the intent of deceiving the courts and county clerks in order to fraudulently obtain default judgments against the Plaintiffs.

161.   Each of the above acts of misconduct constituted a violation of N.Y. Judiciary Law § 487.

162.   As a direct and proximate result of the foregoing misconduct, Plaintiffs suffered pecuniary and non-pecuniary damages.

163.   Pursuant to N.Y. Judiciary Law § 487, Plaintiffs are entitled to compensation in the form of actual and treble damages, costs and attorney fees.

### PUNITIVE DAMAGES

164..   The outrageous nature of Defendants' conduct, as set forth above, justifies the imposition of punitive damages to punish the Defendants and deter such conduct in the future.

### TOLLING

165.   The assertion of any statute of limitation as a defense by the Defendants which might otherwise bar any claim herein is precluded by estoppel and the Defendants' fraudulent concealment.

35

166.    Defendants knowingly, affirmatively and actively concealed the falsity of the SYR affidavits of service, the lack of "personal knowledge" on the part of Lam and others signing affidavits of merit on behalf of U.S. Equities, and their consistent inability to establish a *prima facie* case sufficient to support even a default judgment.

167.    The Defendants continued to prepare, sign, file and submit false Complaints and affidavits until forced to do so by the Attorney General. Even then, Defendants did not admit any wrongdoing.

168.    Until being required to do so in the AOD, Strumpf made no effort to notify thousands of Class members that they were entitled to a vacatur of their default judgments. Even then, an offer of vacatur was contingent upon a waiver of any claim against Strumpf and U.S. Equities.

169.    The Consent Order signed by SYR was never entered with the Clerk. There was no action commenced against Strumpf, and the AOD was only made public when Strumpf submitted it in response to Snyder's motion.

170.    Defendants, by deliberate act and omission, have prevented the Class members from becoming aware of their potential claims.

WHEREFORE, Plaintiffs and all members of the proposed Class, request the following relief jointly and severally as against all Defendants:

    a.)    An Order certifying this case as a class action under Fed. R. Civ. P. 23;

    b.)    A Judgment declaring that Defendants have committed the violations of law alleged in this action;

    c.)    Actual and/or compensatory damages against all Defendants in an amount to be proven at trial;

d.)    Treble damages pursuant to RICO and N.Y. Jud. Law § 487;

e.)    Punitive damages;

f.)    Statutory damages pursuant to the FDCPA;

g.)    An Order awarding costs, disbursements and attorney fees
pursuant to FDCPA, RICO, and N.Y. GBL § 349;

h.)    Such other relief as may be just and proper.

## JURY DEMAND

Plaintiffs request trial by jury on all issues so triable.

Dated: February 23, 2012

Peter M. Hartnett, Esq.
Craig J. Billinson & Associates
342 South Salina Street
Syracuse, NY 13202
(315) 471-6265